IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Jackson June 3, 2008

## STATE OF TENNESSEE v. MELVIN L. TAYLOR

**Appeal from the Criminal Court for Davidson County
No. 2004-B-1400   Seth Norman, Judge**

_____

**No. M2007-01924-CCA-R3-CD - Filed December 19, 2008**

_____

A Davidson County jury convicted the defendant, Melvin L. Taylor, of one count of aggravated kidnapping and one count of attempted aggravated rape, both Class B felonies, and one count of aggravated assault, a Class C felony. The defendant received a total effective sentence of 30 years in the Department of Correction. On appeal, the defendant asserts that the evidence produced at trial was insufficient to sustain his aggravated kidnapping conviction. After reviewing the record, we affirm the judgments of trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Melvin L. Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Dan Hamm and Sharon Reddick, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

At trial, Kelly Buran testified that after getting off work the evening of January 20, 2004, she went to Tootsie's, a bar on Broadway in downtown Nashville, where her then-boyfriend, Raegan Dunphy, was a bouncer. Buran testified that because Dunphy was not scheduled to leave work until after the bar closed at 3:00 a.m., she visited several downtown bars. Buran testified that she returned to Tootsie's around 2:00 the morning of January 21. Buran said that although she had consumed alcohol in her visits to the other bars, she was not intoxicated when she returned to Tootsie's.

Buran testified that when she returned to Tootsie's, she was tired from working a double shift at a Chili's restaurant, where she worked as a waitress. Therefore, Dunphy suggested that Buran lie down in the car, an Infinity J30, that the two were borrowing from a friend. Dunphy and Buran got into the car, which was parked behind a nearby bar, and Dunphy drove the car onto Broadway, parking the car two buildings down from Tootsie's on the same side of Broadway so that Dunphy could keep an eye on the car from his post outside Tootsie's front door. Buran testified that she reclined the front passenger-side seat and fell asleep. She said that she did not lie down on the car's back seat because had she done so, Dunphy would have been unable to see her from his post. She also said that she did not recline her seat as far back as she could have. Buran said that Dunphy kept the car running so that the car's heater could operate, and she also said that she and Dunphy agreed to keep the car's doors unlocked. She said that they kept the doors unlocked because she was a "really hard sleeper" and they did not want Dunphy locked out of the car once he returned.

Buran testified that when she awoke, she "sat the seat up" and "look[ed] for Raegan to see where we were." Buran noted that she was in a residential area, which led her to initially think that she was at a friend's house. However, she noticed that the time was 3:00 a.m., meaning that Dunphy still would have been working. She then looked outside the passenger-side window and noticed a man walking toward her door, which was closed. The man, who was wearing a black stocking hat, glasses or goggles over his eyes, and a hooded jacket with pockets on the sides, kept his right hand covered with a black bag. The man said that he had a gun in the bag, which led Buran to believe that "he was pointing a gun at me." The man then opened the door and stood outside the open door, pointing the weapon at Buran. After telling Buran that he had a gun, the man ordered her to give him all her rings and jewelry, which she did. The man also asked for money, but Buran told him that she had none. Buran said that the man asked for her necklace after she had given it to him; she replied that she had already given him the necklace, but the man continued asking for the necklace and placed his hand down her shirt and felt around for it.

Buran said that after she gave her jewelry to the assailant, he told her, "I want you to have sex with me." Buran replied that she would not have sex with him. The man then shrugged his shoulders and replied, "[I]t's either that or your life." After this exchange, Buran noticed that the assailant "kind of looked like he was hesitating to take out what he said was the gun out of this bag," so Buran grabbed the bag and pointed it toward the ground. This led the assailant to pull Buran out of the car. Buran responded by attempting to kick the assailant in the groin. Buran said that the man fought back, hitting her over the head with the weapon approximately twenty times. Buran continued to struggle with the man, ultimately grabbing his face and squeezing it as hard as she could. The man, who had the Infiniti's keys in his possession, then got into the car and drove away.

After the assailant drove away, Buran ran across some lawns in a neighborhood. While she was running between two houses, one of the residents asked her "what's a white girl like you doing in a neighborhood like this?" Buran explained her situation and asked to use the woman's phone to call police. The woman refused to let Buran use the phone or enter her house. Rather, the woman pointed Buran toward Nashville General Hospital at Meharry. Buran ran in the direction the woman indicated, despite being unable to see the hospital at the time. Ultimately, after running across the

street and up a hill, a distance which Buran testified "felt like a couple blocks," she encountered a security guard who was driving around outside the hospital. Buran got into the security guard's vehicle, and the security guard then contacted the Metropolitan Nashville Police Department.

Buran said that once the police arrived, the officers asked her some questions about the incident. She did not recall exactly what she told them, but she remembered that the officers "were mainly concerned if I was raped or not." She also testified that she spoke to the security guard about the incident before the police arrived, but she did not see the security guard write anything down. Buran said that after speaking to the police outside the hospital, she was transported to a police facility where her injuries were photographed and fingernail scrapings were taken. The photographs taken the night of the incident show the victim with bruises on her head and scratches on her face.

Buran testified that the night after the incident, Detective David Elliott with the Metro Police Department took her to the residence where she got into the altercation with the assailant. The police found a hat at the scene; Buran testified that this cap was the one that the assailant had been wearing during the incident. The police also located an earring, which Buran identified as one that she had been wearing during the incident.

Buran testified that she gave a police sketch artist a description of the assailant. Buran said that the resulting composite sketch looked similar to the assailant but that the sketch did "not completely" look like him. Buran said that she and the sketch artist went "back and forth about the chin and a little bit of the facial features." Buran also testified that the police had her review three photograph arrays. She said that she identified a suspect in two of the arrays, but she admitted that she told police that she was not a hundred percent certain that either person she identified was the assailant. Finally, Buran said that she was shown surveillance video taken the morning of the incident from outside a business on Broadway that was located near Tootsie's. Buran said that the person depicted on the video was the person who attacked her later that night. When asked to identify the person in court, Buran said that the person was the defendant.

On cross-examination, Buran said that she told police after the incident that her assailant was 5'5" tall. When asked if a police report indicating that she had told police that the assailant was taller would be erroneous, Buran said that "when I was sitting in the car, it was kind of hard to tell what the height was." She also said that the assailant had a mustache and that his face "looked kind of rough" and that she told the sketch artist that the assailant had facial hair. However, she noted that the person depicted in the composite sketch did not have facial hair. She also admitted that while she remembered the assailant wearing a dark jacket the night of the attack, she did not see whether he was wearing gloves and did not notice the type of footwear he was wearing. Buran admitted that while the assailant was wearing goggles the night of the incident, no goggles were found at the scene. She also admitted that she did not see who actually drove the car from Broadway to the neighborhood near the hospital.

Buran said that her altercation with the assailant took about five minutes and that while she screamed for help throughout the struggle, nobody responded to her cries. She told police that

during her altercation with the assailant, when she grabbed for the object the defendant was holding, she noticed it was not a gun, and therefore she began scuffling with the defendant. She also said that several hours after the incident, she told Detective Elliott that the defendant told her "I want you to have sex with me," and that if other police reports indicated that she told police the assailant told her "you'll f—k me or die," they were inaccurate as she never told police that those were the assailant's words.

On redirect, Buran testified that her initial conversations with police and the security guard outside the hospital were difficult and that her conversation with police detectives, including Detective Elliott, some time after the incident was more thorough and detailed. She also said that as part of her later statements, she said that the assailant was between 5'6" and 5'8" tall and weighed between 140 and 150 pounds. She also said that the person depicted in the surveillance video was the same person who attacked her later that night, and that this person was the defendant.

Raegan Dunphy, who was Buran's boyfriend at the time of this incident, testified that Buran arrived at Tootsie's the morning of the incident, and at some point after she arrived, she told him that she was tired. Therefore, Dunphy suggested that Buran sleep in the car the two had been sharing. Buran agreed, and Dunphy drove the car, an Infiniti J30, onto Broadway, parking it some thirty to fifty feet (or, as Dunphy agreed, three to four car lengths) from Tootsie's front door on the same side of Broadway as Tootsie's. Dunphy left the car running because it was cold outside and left the doors unlocked because he did not want to be locked outside the car upon returning to the car at the end of his shift. Dunphy said Buran lay down in the front passenger seat, and that he could see her in the car from his work post at Tootsie's front door. He claimed that Buran did not get into the rear passenger seat at any time.

Dunphy said he remained at his work post until near the end of his shift, which concluded when the bar closed at 3:00 a.m. He said that he attempted to keep an eye on the car as much as possible, but given the nature of his job, which required him to check the identification of every patron entering the bar, it was not possible for him to constantly watch the car. Dunphy testified that toward the end of his shift, he went inside the bar to stack tables. He said he spent fifteen to twenty minutes inside, and when he returned outside, the car was gone from its parking spot. Dunphy testified that nobody told him that they had seen Buran leave or had seen anyone get into the car and drive away. On cross-examination, Dunphy admitted that it was possible that Buran moved from the front seat to the back seat during a time when he was not watching the car.

Jeanette Merriweather testified that on the morning of January 21, 2004, she heard a scream and barking dogs while inside her residence on Hermosa Street in Nashville. Merriweather looked outside her window and saw a white woman running in the direction of Nashville General Hospital. Merriweather said that a few days later, the police spoke with her about the incident and showed her a composite sketch of a suspect. At that point, Merriweather told police that she had seen a man who looked like the person depicted in the sketch walking up and down the street on several occasions since October 2003. She also recalled that on one occasion, she went to her mailbox and saw the man standing across the street, about fifteen feet away from her, saying nothing to her and staring

at her. Merriweather said she did not know the man's name, but while on the witness stand she identified this person as the defendant. Merriweather testified that each time she saw the defendant, he was wearing a blue jacket, blue jeans, and a dark "sweater[-]like cap."

On cross-examination, Merriweather said that she wore reading glasses but that she could see objects at a distance without the glasses. She said that she did not call the police the morning of the incident because at that time, incidents would constantly happen near her house and therefore the police would not come to her neighborhood when called. Merriweather said that the person she saw walking through the neighborhood would "always" go to some apartments down the street from her residence. On redirect examination, Merriweather testified that the person she saw in the neighborhood looked like the person depicted in the composite sketch, although on recross-examination she noted that the person depicted in the composite sketch lacked facial hair.

Larry Morris, a security guard employed by Nashville General Hospital at Meharry, testified that while on duty the morning of January 21, 2004, he observed Buran running toward his vehicle. Morris said that at the time, she was "very frantic, scared, hollering, screaming and crying." After Buran calmed down somewhat, she related what had happened to her, which led Morris to call the Metro police. The police arrived a short time later. On cross-examination, Morris said that at the time of the incident, the Metro police responded to all calls concerning incidents in the neighborhood in which the hospital was located.

Officer Scott A. McGonical with the Metropolitan Nashville Police Department testified that on January 21, 2004, he responded to a call concerning this incident. He said that he first went to Tootsie's at some point after 3:00 a.m. to assist with the police investigation there, and he later proceeded to Meharry. After arriving at the hospital, he came upon Buran, who by this time was speaking with two police officers. Officer McGonical did not speak to Buran but he did hear her conversation with the other officers. Officer McGonical later filed a written report based on what he heard; in that report, which was admitted into evidence, he wrote that Buran had told police that she had lain down in the back seat of the car outside Tootsie's. He also wrote that Buran had told police that her assailant told her, "you will f—k me or die."

Sergeant David Leavitt with the Metropolitan Nashville Police Department testified that he was dispatched to Meharry the morning of January 21, 2004. Upon his arrival, he observed Buran talking to other Metro police officers. Like Officer McGonical, Sergeant Leavitt did not ask Buran questions but was able to hear her answers to the other officers' questions. Sergeant Leavitt also filed a written report in connection with the case; in the report, he wrote that Buran told police that she had been sleeping in her car's back seat outside Tootsie's and that the assailant told her "I'm either going to f—k you or kill you."

Officer Gerald McShepard with the Metropolitan Nashville Police Department testified that at some point following the incident, the lead detective in this case contacted him and asked him to show Buran a photograph array. Officer McShepard did so on February 12, 2004. He said that the defendant's photograph was not contained in this array, and that Buran identified the person

identified as number 3 in the array, Robert Louis Puryear. The officer testified that Buran was not one hundred percent certain that the person she identified was the assailant and that this identification was not sufficient for the police to obtain an arrest warrant at that time.

Officer Johnny Lawrence testified that he worked on this case as part of his duties with the Metropolitan Nashville Police Department's technical investigation services division. Officer Lawrence said that a few hours after the incident, a Metro police detective brought Buran to Officer Lawrence's office in downtown Nashville, where the officer photographed the victim's injuries and took scrapings underneath Buran's fingernails. Officer Lawrence testified that the fingernail scrapings were sent to the Tennessee Bureau of Investigation (TBI) crime lab for DNA testing. Officer Lawrence said that the night after the incident, he took photos outside the Hermosa Street residence where the victim and the assailant fought. He said that the police collected a rusted piece of steel, a black stocking cap, and one "loop earring" from the crime scene.

Detective David Elliott with the Metropolitan Nashville Police Department testified that he was the lead investigator in this case. He said that he met with Buran at 9:00 the morning of the incident and took a statement from her. The detective testified that Buran told him that "she was sitting in the front passenger seat with it reclined," and he also said that Buran did not deviate from this version of events. Detective Elliott said that Buran "felt as though [the officers at the hospital] were willing to help, but they were kind of there and not listening as well as she thought they should be." The detective said that he also took a DNA swab from Buran, as was common in cases such as this one. On the evening of January 21, Detective Elliott and another detective followed Buran and Dunphy to the Hermosa Street residence. He noted that the police found "a black stocking cap, a piece of iron that could have been used in the attack and also Ms. Buran's hoop gold earring that was missing."

Detective Elliott said that he acquired surveillance video taken from outside a Broadway business the morning of the incident. The video, which showed the area in which Dunphy parked his car, was played in open court and introduced into evidence. The detective testified that the video showed the rear brake lights of the green Infiniti that Dunphy drove that evening. As the video continued, the suspect walked down the sidewalk and came into view at 2:36 a.m. According to the detective, the suspect was seen on the video wearing a purple jacket and black hat. The detective noted that the suspect initially appeared to be "leaning up against the wall . . . looking in the area of the car that's parked." At 2:46 a.m., the video depicted the suspect behind Dunphy's car; the suspect was then seen walking on the driver's side toward the front of the vehicle. The suspect then disappeared from view; a short time thereafter, the Infiniti's brake lights lit up before the car exited the parking space and drove away.

Detective Elliott said that he obtained a still photograph of the suspect from the surveillance video. Five days after the incident, the detective showed the photograph to residents of the neighborhood surrounding the Hermosa Street residence. The detective said that after showing this picture around the neighborhood, the local rescue mission, and the Metropolitan Police Department's Charlotte Avenue precinct station, the police developed the defendant as a suspect. After developing

the defendant as a suspect, the detective asked Buran to examine two photograph arrays, one which contained the defendant's photograph and one which did not. Buran said that she was unsure whether any of the persons depicted in the array not containing the defendant's photograph looked like the assailant. Regarding the array containing the defendant's photograph, Buran told the detective that the defendant's photograph looked like the suspect but that she was not one hundred percent sure of her identification. Detective Elliott said that this identification was not sufficient for the police to arrest the defendant but that it was sufficient for the police to continue to investigate the defendant as a suspect.

Detective Elliott testified that the police examined the green Infiniti for fingerprints but no usable prints were found, a situation which the detective said was common. He also said that no evidence was found in the hat recovered from the crime scene. He said that on January 30, the defendant volunteered a DNA sample to police; the sample was one of eight that was sent to the TBI crime lab. On May 5, the TBI informed Elliott that the DNA found in the scrapings underneath Buran's fingernails matched the defendant's DNA. At that point, the defendant was arrested.

On cross-examination, Detective Elliott was asked about the differences between Buran's statement to him, in which she said that the assailant told her, "I want you to have sex with me," and her statements to police outside the hospital, in which Buran supposedly related that the assailant used vulgarities in his demands for sex. The detective said that in some instances, a statement given by a victim to police some time after the incident would contain different details from a statement given immediately after the incident because the victim could be "a little more lucid later on." The detective said this could particularly be true in cases where the victim had "just been woken up" or was intoxicated shortly after the incident, or if the victim was a "shady type character."

Detective Elliott said that the DNA from the scrapings taken from under Buran's fingernails was compared against the DNA profiles that were present in the CODIS database maintained by the Federal Bureau of Investigation (FBI), but the sample taken from the victim did not match any profile in CODIS. He also noted that someone attempted to use the victim's credit cards after they were taken from her purse during the incident. He said that the police looked at the surveillance videos from the businesses where someone attempted to use the cards, but some of the videos did not show someone attempting to use the cards, and in those videos showing someone attempting to use the cards, the person did not match the defendant's appearance.

Detective Elliott admitted that the surveillance video taken outside the Broadway businesses did not actually show the person believed to be the defendant enter the victim's vehicle and drive away. However, he said that because the video showed the person walking toward the driver's side door and "right after" the person disappeared from view the car drove off, one could "reasonably deduce that it was h[e] [who] got in."

On redirect, Detective Elliott said that the defendant was the police department's "top suspect" in this case but that the department continued to investigate other suspects until the TBI issued its report regarding the DNA evidence, a process that took four or five months.

TBI Special Agent Mike Turbeville testified that he conducted serology DNA tests on several items taken from the crime scene and the scrapings taken from beneath the victim's fingernails. Agent Turberville compared the DNA from the fingernail scrapings against DNA samples volunteered by six suspects, including the defendant, and DNA lifted from a Styrofoam cup that had been discarded by a suspect who did not knowingly provide a sample. He also compared the DNA from the fingernail scrapings against DNA profiles that were present in the FBI's CODIS database. The agent said that the DNA from the fingernail scrapings did not match any of the CODIS profiles but did match the DNA sample submitted by the defendant.

On cross-examination, Agent Turberville admitted that pursuant to Tennessee Code Annotated section 40-35-321, the DNA profile of any person convicted of a felony in Tennessee on or after July 1, 1998 was to be maintained in CODIS. When asked why a person who, like the defendant, had been convicted of a felony in October 1999 did not have his DNA profile in CODIS as of January 2004, Agent Turbeville replied that "as far as sample collection, [and] the rules tied to that, I'm not the person to ask that question." The agent said that "assuming [the defendant's DNA profile] was in the system, I probably would have gotten a DNA match."

After the jury received the evidence, it convicted the defendant of one count of aggravated kidnapping and one count of attempted aggravated rape as charged in the indictment. The jury acquitted the defendant of aggravated robbery but convicted him of the lesser included offense of aggravated assault. The trial court sentenced the defendant to fifteen years as a violent offender on the aggravated kidnapping conviction, fifteen years as a multiple offender on the attempted aggravated rape conviction, and eight years as a multiple offender on the aggravated assault conviction. The trial court ordered the two fifteen-year sentences to be served consecutively to each other, resulting in an effective thirty-year sentence. The defendant subsequently filed a timely notice of appeal.

## ANALYSIS

On appeal, the defendant asserts that the evidence produced at trial was insufficient to sustain his conviction for aggravated kidnapping. Particularly, he argues that the evidence was insufficient to establish that the defendant was the person who actually committed the offense. The defendant bases his argument on his claim that "[t]here was not one single witness who testified that they saw the Appellant drive the car with the victim in it from Tootsies to anywhere." He also argues that the surveillance video from the businesses near Tootsie's "fail[s] to show anyone . . . actually get into the vehicle and drive away from Tootsies." Finally, he argues that the victim gave inconsistent statements to police, including one the night of the incident where she said that she was asleep in the back seat of the Infiniti and said that it was possible that the driver never saw her. The defendant also argues that "the insufficient evidence on the aggravated kidnapping charge so prejudiced [him]

that the remaining convictions should fall."[1]  After reviewing the record, we conclude that the defendant's assertions are without merit.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Aggravated kidnapping is defined, as relevant to this case, as false imprisonment committed "[t]o facilitate the commission of any felony or flight thereafter." Tenn. Code Ann. § 39-13-304(a)(1) (2003). The indictment in this case identified the underlying felony as "theft of a vehicle." "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a).

In this case, the surveillance video taken outside a business on Broadway the morning of the incident showed a man wearing a hooded jacket and a stocking cap, later identified as the defendant, walking in the area of the victim's parked car. The video then showed the defendant walking toward the car on its driver's side before disappearing from view. A few seconds after the defendant disappeared from view, the car pulled away. Although two police officers insisted that the victim told them that she was lying in the back seat of the vehicle when she fell asleep, the jury discounted this testimony, as was its prerogative, and accredited the testimony of the victim and Detective Elliot, both of whom testified that the victim was lying in the front passenger seat at the time she fell asleep. The victim then awoke to discover a person wearing a hooded jacket and a stocking cap pointing an object toward her and demanding her jewelry. The victim gave this person her jewelry, after which time the two got into a physical altercation, which ended with the defendant driving away in the victim's car. DNA evidence taken from the victim revealed that the assailant was the defendant. In light of this testimony, we conclude that the jury could have found the defendant guilty of

_____

[1]As we are concluding that the evidence is sufficient to sustain the defendant's aggravated kidnapping conviction, we need not examine this assertion. Furthermore, even were we to consider the issue, it would be waived, as the defendant has offered no argument or citation to authority to support his assertion. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

aggravated kidnapping beyond a reasonable doubt.  We therefore deny the defendant relief.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE